IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF VIRGINIA
ROANOKE DIVISION

| | | |
|---|---|---|
| SOUTHERN COAL CORPORATION, | ) | |
| | ) | |
| Plaintiff, | ) | Civil Action No. 7:19-cv-00457 |
| | ) | |
| v. | ) | |
| | ) | By: Elizabeth K. Dillon |
| BRICKSTREET MUTUAL INSURANCE COMPANY, | ) | United States District Judge |
| | ) | |
| Defendant. | ) | |

**MEMORANDUM OPINION**

Plaintiff/counter-defendant Southern Coal Corporation ("Southern Coal") brought several contract and tort claims against defendant/counter-plaintiff Brickstreet Mutual Insurance Company ("Brickstreet") stemming from Brickstreet's performance under Southern Coal's workers' compensation and employers' liability insurance policies in 2017. Brickstreet filed a counterclaim for breach of contract resulting from Southern Coal's failure to reimburse Brickstreet for claims and expenses under the policies. The court granted Brickstreet's motion for summary judgment (both as to Southern Coal's claims and its own breach-of-contract counterclaim) as to the merits. However, at that time, the court found that Brickstreet had not yet met its burden on summary judgment regarding its request for injunctive relief requiring specific performance. The court set further proceedings to determine the appropriate type of injunctive relief and/or amount of damages.

Now pending before the court is Brickstreet's "motion for appropriate remedies." (Dkt. No. 139.) After full briefing, the motion is ripe for resolution. For the reasons that follow, the court will grant the motion, issue an injunction requiring specific performance by Southern Coal, and order payment of attorneys' fees.

I.  BACKGROUND

Southern Coal is one of several entities—hereinafter referred to as "Justice entities"—owned by West Virginia governor and businessman Jim Justice.  In 2015, Southern Coal contracted with Brickstreet to obtain workers' compensation and employers' liability insurance.  (Dkt. No. 48-1.)  Southern Coal purchased high deductible insurance policies for two years.  (Am. Compl. ¶¶ 6-10, Dkt. No. 48.)  Under the policies, Southern Coal was obligated to pay losses of up to $3 million, and no more than $500,000 on any one individual claim, for each policy year.  (*Id.* ¶ 11.)  As part of the payment of losses up to the deductible amount, Southern Coal was obligated to pay Brickstreet 12.5% of any losses as Allocated Loss Adjustment Expense ("ALAE") to cover the expenses incurred in the administration of the claims.

To secure payment on an insurance claim, the policies provided that Southern Coal had to: (1) establish Loss Fund Collateral (Loss Fund) in the amount of $1,300,000; (2) post a letter of credit in the amount of $1.7 million for future losses; and (3) post an additional letter of credit in the amount of $1.647 million; and (4) replenish the Loss Fund in the amount of $388,144.  (Dkt. No. 102-1 ¶¶ 5–9.)  Southern Coal was also contractually required to maintain the Loss Fund with a minimum balance of $500,000.  (*Id.* ¶ 9.)

In 2017, Brickstreet resolved liability for an employee workplace death at a Southern Coal-related entity for a total exceeding $500,000.  (*Id.* ¶ 32.)  Brickstreet treated the settlement as two separate claims, each below Southern Coal's $500,000 deductible threshold.  Southern Coal argued the settlement should have been treated as one claim, resulting in reduced liability.

Since July 2, 2017, Southern Coal has failed to reimburse Brickstreet for the claims payments and ALAE due and owing under the written agreements and has failed to maintain the required minimum balance of $500,000 in the Loss Fund.  (Dkt. No. 103 at 5 (citing Dkt. No.

102-1 ¶ 10).)  From May 31, 2019, through June 2020, Southern Coal has failed to pay Brickstreet for various invoices totaling $178,851.76. (Dkt. No. 102-2 at 19–24.)  As of February 24, 2021, Brickstreet has exhausted the letters of credit and used those funds to cover Southern Coal's outstanding invoices and replenish the Loss Fund.  (Dkt. No. 102-1 ¶¶ 12–15.) Brickstreet continues to adjust and pay claims incurred during the relevant policy years. Brickstreet projects a remaining liability at $964,085, which would leave the Loss Fund underfunded by approximately $457,378.  (*Id*. ¶¶ 17–18.)

On June 18, 2019, Southern Coal filed a complaint against Brickstreet alleging breach of contract (Count I), breach of the duty of good faith (Count II), fraud (Count III), and unjust enrichment (Count IV).  (Dkt. No. 1.)  Southern Coal subsequently filed an amended complaint including the same four counts (Dkt. No. 48), though Counts III and IV of the amended complaint were dismissed for failure to state a claim on December 8, 2020.  (Dkt. No 87.) Brickstreet filed an answer and counterclaim on November 6, 2020, alleging that Southern Coal breached its contract with Brickstreet by failing to make required deductible payments and other payments required by the insurance policy.  (Am. Answer 18, Dkt. No. 80.)  Brickstreet then moved for summary judgment, asking the court to dismiss the two remaining counts of Southern Coal's amended complaint, grant judgment on the merits in its favor on its counterclaim, and schedule a hearing to determine future damages and attorneys' fees and costs or, alternatively, enter an injunction requiring specific performance by Southern Coal to maintain the Loss Fund. (Dkt. No. 103.)  Brickstreet later flipped this request in its reply brief and supplemental motion for summary judgment, instead asking the court to enter the injunction or, alternatively, set further proceedings to determine future damages.  (*See* Dkt. Nos. 111, 115.)

At the hearing on the motions for summary judgment, Southern Coal conceded that Brickstreet should be granted summary judgment on all claims. Further, Southern Coal conceded that it is liable to Brickstreet on the counterclaim for breach of contract. As such, the court granted Brickstreet's motions for summary judgment as to the merits. (Dkt. No. 129.) However, the court determined that Brickstreet had not met its burden "to show, as a matter of law, that it suffered an irreparable injury and that legal remedies, such as monetary damages, are not adequate to compensate for that injury," as would be required for an injunction for specific performance. (*Id.*) The court specifically noted that "[a]t the time of briefing and hearing, Southern Coal had satisfied all its current financial obligations to Brickstreet, including replenishment of the Loss Fund to $500,000 by Brickstreet's draw on the letters of credit," and "the evidence in the record—namely, newspaper articles detailing business practices of Southern Coal's owner and sister companies—is not sufficient at this time to show that Southern Coal will be insolvent and monetary damages will not be obtainable." (*Id.* 5–6.)

Since then, Southern Coal has produced additional documents in response to Brickstreet's supplemental discovery requests and, on September 9, 2022, Brickstreet deposed Southern Coal's corporate representative (*See* Deposition of Stephen Ball ["Ball Dep."], Dkt. No. 139-1.) The parties have stipulated to the total predicted remaining liability ($878,949.00), the amount of collateral in Brickstreet's possession ($374,955.00), the total predicted deficiency owed by Southern Coal to Brickstreet under the contract ($503,985.00), and the sum of Brickstreet's invoices for attorneys' fees incurred through September 30, 2022 ($245,929.76)—the latter of which Southern Coal agrees is owed under the contract. (Stip., Dkt. No. 137.)

But the parties still disagree as to what remedy is ultimately appropriate. Southern Coal argues that an award of damages is sufficient, while Brickstreet contends that an injunction

requiring Southern Coal's specific performance under the contract—in other words, a court order requiring Southern Coal to satisfy its contractual obligations by maintaining the Loss Fund—is necessary to ensure that Southern Coal, and not Brickstreet, ultimately pays for the workers' compensation claims.

## II.  DISCUSSION

### A.  Legal Standard

Before a court may issue a permanent injunction, the party seeking the injunction must satisfy the four-element test established in *eBay Inc. v. MercExchange, L.L.C.*, 547 U.S. 388 (2006).  Specifically, the plaintiff must show:

> (1) that it has suffered an irreparable injury; (2) that remedies available at law, such as monetary damages, are inadequate to compensate for that injury; (3) that, considering the balance of hardships between the plaintiff and defendant, a remedy in equity is warranted; and (4) that the public interest would not be disserved by a permanent injunction.

*Id.* at 391.  Further, because the granting of such an injunction is an "extraordinary remedy," *see Winter v. Natural Res. Def. Council, Inc.*, 555 U.S. 7, 22 (2008), any such relief "must be specific in its terms, and it must define the exact extent of its operation so that there may be compliance."  *Noell Crane Sys. GmbH v. Noell Crane & Serv., Inc.*, 677 F. Supp. 2d 852, 877 (E.D. Va. 2009) (quoting *Unit Owners Ass'n of BuildAmerica-1 v. Gillman*, 292 S.E.2d 378, 387 (Va. 1982)).

### B.  Analysis

#### 1.  **Specific performance—replenishing the Loss Fund**

To demonstrate that it has suffered an irreparable injury and that a remedy at law would be inadequate to compensate for that injury, Brickstreet need not establish that "there [is] no physical possibility of repairing the injury;" rather, it must only show "that the injury would be a

grievous one, or at least a material one, and not adequately reparable in damages." *Noell Crane Sys.*, 677 F. Supp. 2d at 877 (quoting *Callaway v. Webster*, 37 S.E. 276 (1900)). Generally, courts are reluctant to find harm to be irreparable when the moving party may be compensated by an award of money damages at judgment. *Hughes Network Sys., Inc. v. InterDigital Commc'ns Corp.*, 17 F.3d 691, 694 (4th Cir. 1994). However, courts have concluded—and Brickstreet in large part argues—that both irreparable harm and a lack of an adequate remedy at law will lie if damages are unobtainable due to the financial status of the liable party (here, Southern Coal). *See, e.g.*, *Amazon.com, Inc. v. WDC Holdings LLC*, No. 20-1743, 2021 WL 3878403, at *8 (4th Cir. Aug. 31, 2021) (per curiam) (observing that irreparable harm may exist where "damages may be unobtainable from the defendant because he may become insolvent before a final judgment can be entered and collected" and agreeing that the defendant's likely "dissipation of assets" before judgment supported a finding of irreparable harm); *SAS Inst., Inc. v. World Programming Ltd.*, 874 F.3d 370, 386 (4th Cir. 2017) ("Collectability concerns may support the issuing of an injunction under certain circumstances.").

Southern Coal and Brickstreet agree, at least in principle, that where the relevant harm can be adequately remedied by an award of damages, injunctive relief in the form of specific performance is not appropriate. But they disagree as to how that principle applies here. Brickstreet claims it has suffered an irreparable injury that cannot be remedied at law because Southern Coal is unlikely to pay a damages award "given its financial status, other judgments against it, and a history of non-payment." (Dkt. No. 140 at 5.) By its own admission, Southern Coal "is an inactive corporation with no ba[n]k accounts or income at present" with "four judgments against it totaling over $20 million." (Dkt. No. 141 at 8.) According to Brickstreet, "when Southern Coal is forced to pay its debts, another Justice entity will come up with the

money to make the payment." (Dkt. No. 140 at 6.) Thus, Brickstreet continues, the only way to ensure" that *Southern Coal itself* complies with its contractual obligations and replenishes the Loss Fund" is "a permanent injunction requiring Southern Coal's specific performance under the contracts." (*Id.*)

Southern Coal, on the other hand, contends that Brickstreet has "[put] forth absolutely no evidence that its business practices will be impacted in any way by an award of money damages." (Dkt. No. 141 at 6.) Rather, according to Southern Coal, the only harm Brickstreet points to is the potential difficulty in collecting a judgment, which can be remedied by post-judgment collection fees and awards." (*Id.* (citing *Boivin v. U.S. Airways, Inc.*, 297 F. Supp. 2d 110, 118–19 (D.D.C. 2003) ("The anticipated injury here – paying more in fees – does not rise to the level of 'irreparable' harm necessary to warrant the extraordinary remedy of a preliminary injunction.'")).)

In denying Brickstreet's initial request on summary judgment for an injunction for specific performance, this court reasoned that Brickstreet had not yet shown Southern Coal to be insolvent and that monetary damages will not be obtainable. (Dkt. No. 129 at 6.) However, since then, Brickstreet has amassed evidence demonstrating that Southern Coal is, in fact, insolvent. Brickstreet's deposition of Stephen Ball, Southern Coal's corporate representative, revealed that Southern Coal and its subsidiaries have no operations or employees, are not mining coal, do not have any income nor any open bank accounts, do not anticipate any operations or profit, and do not have any viable assets to liquidate. (Deposition of Stephen Ball ["Ball Dep."], Dkt. No. 139-1, at 14:15–17, 15:9–17, 17:9–16, 26:6, 30:19–21, 31:9–13, 32:6–9, 54:2–55:3, 70:20–71:2.) There is a piece of real property in Kentucky in Southern Coal's name that is subject to two mortgages; Southern Coal does not believe there is any equity in it, given the two

mortgages. (*Id.* 31:14–32:1, 57:7–10, 57:11–58:3.) Lastly, Bell conceded that Southern Coal both (1) would not be able to pay a money judgment in this case (*id.* 31:1-8), and (2) has millions of dollars in judgments currently pending against it (*id.* 37:11-42). Indeed, Ball had no "estimate as to when Southern Coal will be in a position to begin paying its debts, including the ultimate judgment . . . in this case." (*Id.* 96:4–8.) Given those details, the court has little trouble concluding that Southern Coal is insolvent. *See Insolvent*, Black's Law Dictionary (11th ed. 2019) ("(Of a debtor) having liabilities that exceed the value of assets; having stopped paying debts in the ordinary course of business or being unable to pay them as they fall due.").

In its briefing, Southern Coal claims it is "not insolvent, but merely inactive." (Dkt. No. 141 at 8.) The difference, at least according to Southern Coal, is that its debts are being paid and its judgments satisfied—only by other entities within the "Justice family operations," not by Southern Coal itself. (*Id.*) But that proposed distinction is misleading at best, and entirely inaccurate at worst, given the definition of insolvency as courts understand it. *See, e.g.*, *Wright Sols., Inc. v. Wright*, No. CBD–12–178, 2013 WL 1702548, at *8 (D. Md. Apr. 18, 2013) (adopting *Black's Law Dictionary* of insolvency). Only Southern Coal is liable to Brickstreet under this contract. Thus, any informal debt-assumption agreement between Southern Coal and any other Justice entity bears little, if any, weight on the analysis here. Instead, the determinative question is whether Southern Coal—itself—could pay damages were they awarded. Given the new information Brickstreet has presented, it appears to the court that Southern Coal is an insolvent entity and has conceded its inability to pay such damages.

In *Amazon.com*, after finding that the defendant's assets were "likely to become unavailable before judgment due to 'dissipation of assets'" and that the defendant had "conceded 'likelihood of insolvency,'" the Fourth Circuit observed that "[an] injunction was necessary to

preserve Amazon's interests in [defendant's] asset." *Amazon.com, Inc.*, 2021 WL 3878403, at *8. The injunction awarded was "'carefully tailored' to Amazon's equitable claims and specific figures alleged in its complaint, in order to maintain the status quo and 'preserve [Amazon's] opportunity to receive an award . . . at judgment.'" (*Id.*)  Here, neither the "likelihood of insolvency" and the "opportunity" to receive an award at judgment are even disputed—Southern Coal has already conceded insolvency (informal outside agreements notwithstanding) and the inability to pay a judgment.  And the contract here, which Southern Coal breached, allows Brickstreet to demand that Southern Coal replenish the Loss Fund.  As Brickstreet contends, it would be inappropriate to allow Southern Coal to take advantage of a situation it wrongfully created by continuing to delay its obligation to make these payments.  Accordingly, the court finds that an order requiring specific performance is necessary to maintain the status quo.

Outside of attempting to draw a line between inactivity and insolvency, Southern Coal makes two other arguments as to why an injunction would be inappropriate, both of which fail. First, Southern Coal asserts that "Brickstreet's delay in acting on this potential remedy diminishes its claim of an irreparable injury." (Dkt. No. 141 at 6.)  The court finds this argument unpersuasive.  Southern Coal did not concede liability until the July 2, 2021 summary judgment hearing.  Additionally, Southern Coal—by its own admission—was not paying its invoices as early as 2017.  Thus, even if Brickstreet had moved for a preliminary injunction from the beginning, there was no guarantee that Southern Coal's then-existing assets would remain viable and collectable in the future.  Along the same line, Southern Coal insists that because Brickstreet moved for summary judgment before the existing letters of credit were exhausted and the Loss Fund was allowed to drop below $500,000, it has essentially admitted that its injury is reparable.

But Southern Coal ignores the fact that Brickstreet was required to move for summary judgment when it did is because, per the court's orders, the deadline to do so was May 10, 2021.

Next, Southern Coal claims that Brickstreet has "virtually stipulated to a judgment" and that "a permanent injunction should not be a vehicle for enforcement of collection efforts," essentially arguing that an injunction is not an appropriate remedy for past harm. (Dkt. No. 141 at 8.) In so arguing, Southern Coal incorrectly presupposes that the harm is "past." Even accepting the fact that Brickstreet is still in possession of $374,955 of collateral in the Loss Fund (which is below the contractually required minimum balance of $500,000), the parties agree that this amount of money will not be enough to satisfy Southern Coal's outstanding obligations under the contract. (Stip. 1–2 (agreement between the parties that Brickstreet's total predicted remaining liability under the insurance policy is $878,949.00, leaving a predicted deficiency of $503,985.00 owed by Southern Coal to Brickstreet).) Thus, the harm here is not, in reality "past." Rather, Brickstreet seeks to avoid *future* harm in the form of those *future* payments.

Lastly, Southern Coal argues that Brickstreet clearly has an adequate remedy at law because it has not demonstrated how or whether its business practices would be in any way impacted by an award of money damages in lieu of an injunction. But in doing so, Southern Coal fails to point to any case law or other authority indicating that Brickstreet is required to make that showing to obtain injunctive relief.[1] Quite the contrary, Brickstreet has demonstrated that several factual conditions which the Supreme Court has previously found sufficient for injunctive relief are present here—namely, that the defendant is "insolvent and threatened with many law suits, that its business is virtually at a standstill . . . , that preferences to creditors are

---

[1] Rather, the one case Southern Coal cites in support of that proposition—*Boivin v. U.S. Airways, Inc.*, 297 F. Supp. 2d 110 (D.D.C. 2003)—is an ERISA case in which the court denied a preliminary injunction based on miscalculations in the preliminary benefits determination. Those issues hardly resemble the issues in this case.

probable, and that its assets are in danger of dissipation and depletion" (indeed, they are *already* dissipated and depleted). *See Deckert v. Indep. Shares Corp.*, 311 U.S. 282, 285 (1940).

Southern Coal does not respond to Brickstreet's arguments that the third and fourth elements of the *eBay* test—the balance of hardships and the public interest—weigh in favor injunctive relief. Such non-opposition to those arguments is tantamount to a concession that the balance of hardships and service of the public interest tilt in Brickstreet's favor. *See, e.g.*, *United Supreme Council, 33 Degree of the Ancient and Accepted Scottish Rite of Freemasonry, Prince Hall Affiliation, S. Jurisdiction of the U.S. v. United Supreme Council of the Ancient Accepted Scottish Rite for the 33 Degree of Freemasonry, S. Jurisdiction, Prince Hall Affiliated*, 329 F. Supp. 3d 283, 292 (E.D. Va. 2018) ("Failure to respond to an argument made in a dispositive pleading results in a concession of that claim."); *Yahya v. Barr*, No. 1:20-cv-01150, 2021 WL 798873, at *2 (E.D. Va. Jan. 19, 2021) ("Because [plaintiff] has failed to address an argument made in a dispositive pleading, the Court must accept the argument as conceded."). As a result, the court finds that an injunction requiring specific performance by Southern Coal is the appropriate remedy here.

### 2. Attorneys' fees

Under Virginia law, parties to a contract may allocate attorneys' fees and costs via an indemnity clause. *See Hitachi Credit Am. Corp. v. Signet Bank*, 166 F.3d 614, 631 (4th Cir. 1999) (citing *Chesapeake & Potomac Telephone Co. v. Sisson & Ryan, Inc.*, 362 S.E.2d 723, 728–29 (Va. 1987)). Here, the parties' agreement provides for the recovery of attorneys' fees "incurred by [Brickstreet] in connection with the collection or enforcement of any of [Southern Coal's] obligations to [Brickstreet]." (*See* Dkt. No. 80-3 at 9.)

After the court deferred ruling on the issue of attorneys' fees and costs, Brickstreet provided Southern Coal with invoices for attorneys' fees incurred through September 30, 2022, in the amount of $245,929.76.  (Stip. 2.)  Moreover, pursuant to the parties' stipulation, Southern Coal does not challenge this amount of attorneys' fees and agrees that this sum is owed under the contract.[2]  The court finds the agreement both fair and reasonable in light of difficult issues ably litigated in this case, and commends the parties and their skilled counsel in reaching such amicable resolution.  Accordingly, the court will award Brickstreet attorneys' fees in this amount.[3]

### III.  CONCLUSION

For the foregoing reasons, the court will grant Brickstreet's motion for appropriate remedies (Dkt. No. 139) and will issue a separate judgment order requiring Southern Coal to satisfy its obligations under the contract by replenishing the Loss Fund in the amount of $503,985.00 and awarding attorneys' fees to Brickstreet in the amount of $245,929.76.

Entered: September 28, 2023.

/s/ Elizabeth K. Dillon
Elizabeth K. Dillon
United States District Judge

---

[2] In its briefing on the motion for appropriate remedies, Brickstreet did not revise its request to include any attorneys' fees incurred after September 30, 2022, in relation to briefing this motion; thus, the court will not order Southern Coal to pay any such fees at this time.

[3] Southern Coal insists that, by seeking a monetary award of attorneys' fees, Brickstreet undercuts its claim for injunctive relief as to the Loss Fund because "there is simply no difference between the Loss Fund requirement in the contract and the contract's requirement that Southern Coal pay attorney's fees," given that "[e]ach flow from the same contract and same stipulation."  (Dkt. No. 141 at 10.)  However, unlike the attorneys'-fees portion of the contract, the Loss Fund requirement is structured such that Brickstreet can essentially demand pre-payment of the amounts owed.  On the other hand, Brickstreet evidently would not have been entitled to pre-payment of attorneys' fees.  In other words, incurring attorneys' fees, unlike the non-maintenance of the Loss Fund, is plainly a "past harm," and Southern Coal has conceded that such past harm is properly remedied at law.  (*See id.* 8.)